| | | |
|---|---|---|
| Leatherback Limited<br>　The News Building,<br>　3 London Bridge Street,<br>　London, UK SE1 9SG<br>　　　　　　　　　Plaintiff<br>　　　vs.<br>Lolu Adubifa<br>　Lapal House 2nd Floor,<br>　235 Igbosere Road,<br>　Lagos Island Lagos.<br>　　　　　　　　　Defendant | *<br>*<br>*<br>*<br>*<br>*<br>*<br>* | In the United States District Court<br><br>For<br><br>Maryland<br><br><br><br>Case No.: 1:23-CV-02614 |

# Memorandum in Support of Motion for Temporary Restraining Order

Comes Now, Leatherback Limited, by and through its attorneys, Jimi Kolawole, and Kolawole Law Firm LLC, file this Memorandum in Support of its Motion for Temporary Restraining Order and in support thereof state as follows:

## I.  Introduction and Summary of Argument

Defendant made false accusations of criminality against Leatherback to a critical partner to Leatherback's business. Under Maryland law, Defendant's statements are defamatory *per se*. *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1123 (Md. 1979). In addition, because Lolu Adubifa or Lavayo Energy are not direct Leatherback customers, its statements to Leatherback's partner constitutes Tortious Interference of Business Relations. *Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 628 (2003). To prevent continuous harm to Leatherback, this Court should grant a Restraining Order against Defendant because (1) Leatherback is likely to succeed in its case on the merits as Defendant's statements are Defamatory *per se*, (2) Leatherback would likely suffer irreparable harm in the absence of preliminary relief as continuous negative contact will cause Leatherback's critical partner to discontinue the business relationship, which means an end to Leatherback's business; (3) the equities are in favor of Leatherback as Defendant is already pursuing resolution of its grievances in other appropriate *fora*, and (4) an injunction is in the public's interest as Leatherback's business makes hitherto unavoidable opportunities for small business to participate in the global market. For these reasons and others stated below, this Court should grant an Order to restrain Defendant from contacting Leatherback's partner.

II.     Facts

Leatherback is a financial technology company offering innovative products to simplify cross-border transactions. Leatherback allows its customers to maintain several accounts in several currencies. Each currency account is domiciled at a local bank in the country where the currency is a local tender. As such, when a Leatherback customer makes a payment through an account, the transaction originates from the local bank, thereby resolving the complexities associated with cross-border transactions. Currently, Leatherback allows its customers to maintain accounts in Nigerian Naira, US Dollars, and British Pounds. For each currency type, Leatherback has a partnership with a local bank in the country where the currency is a local tender. For the US Dollar, Leatherback partners with Community Federal Savings Bank, Woodhaven, New York (CFSB).

None of Leatherback's customers are customers of CFSB. Rather, Leatherback is the entity that banks with CFSB, while Leatherback customers maintain sub-accounts housed under Leatherback-CFSB account. Leatherback is responsible for determining the legitimacy of its customers and their transactions. CFSB counts on Leatherback to ensure that no laws are broken. As such, if CFSB comes to doubt Leatherback's capacity to police its customers, it would likely discontinue the relationship. Without the relationship, the entire business model falls apart.

SDQ Facilitators was a Leatherback customer who was onboarded on Leatherback's platform as a third-party logistics company. SDQ presented itself as a company that engages in freight forwarding for third parties. From time to time, SDQ made payments into its Leatherback account in Nigeria and through Leatherback converted the deposit to US dollars and moved them into its US Dollar denominated account on Leatherback. From time to time, SDQ instructed Leatherback to make payments, backed by invoices verified by Leatherback, to companies around the world for SDQ clients. Leatherback neither controlled what SDQ deposited nor determined whose invoices got paid. Like any financial institution, Leatherback had no control over who made payments to SDQ or who owned monies SDQ deposited into its accounts or for that matter, whether or not SDQ used Leatherback's services for any customer. Leatherback was only responsible for following SDQ instructions and ensuring that the instructions it executed were for legitimate transactions. Allegedly, the individuals behind SDQ are on the run because they collected funds from Defendant to facilitate payments that were never made. Defendant has now turned its ire on Leatherback.

Defendant, Lolu Adubifa, is the managing director of Lavayo Energy, allegedly a customer of SDQ Facilitators who made payments to SDQ but did not receive value for those payments. On

September 6, 2023, Defendant's Attorney, sent the following email to Community Federal Savings Bank.

> Hi Fatima,
>
> Thank you so much for your time this morning.
>
> As discussed, my client who you spoke to this morning is Lolu Adubifa, Managing Director of Lavayo Energy, which is a sub-broker of SOO Ventures Limited, a UK-based financial advisory and brokerage firm. Lolu is copied here, and he is working closely with Mr. Ade Agbede, who is Director of SOO Ventures.
>
> During July and August, SOO Ventures attempted to facilitate Forex transactions for their clients through Letterback via SDQ Facilitators. Related to that, funds were transferred to an account at Providus Bank controlled by the Letterback/SDQ for conversion from Naira to Dollar. However, Letterback/SDQ have failed to confirm payment despite funds being credited to their account. Therefore, we ask you to confirm whether the transactions summarized in the attached excel sheet cleared at your bank, and whether the banking instruments are known and issued by your bank.
>
> 1. Petition to Inspector General from Nigerian counsel
> 2. Letter from Inspector General to police staff regarding the fraud
> 3. Press on the fraud: https://techcabal.com/2023/09/05/leatherback-denies-sdq-facilitators/
> 4. Letter to Providus Bank from Nigerian counsel
> 5. Excel sheet summarizing transactions

On September 7, 2023, undersigned counsel for Leatherback responded to Defendant's counsel. Undersigned counsel asked that Defendant to cease communicating with CFSB on Leatherback matters or cease interfering with Leatherback's business relationship. Undersigned counsel also responded Defendant's questions, informing him that the attached telexes were fake and alien to Leatherback and that none of the referenced funds were deposited into any Leatherback account and none of the USD wires referenced were initiated through a Leatherback account. In addition, as proof of the inauthenticity of the telexes Defendant was parading, undersigned counsel attached an original Leatherback telex, which was clearly different.

On September 11, 2023, Defendant's counsel sent another email to CFSB.

> As of today, my client – a Delaware limited liability company – is part of a group that believes that they have been defrauded of funds paid. My client believes that this fraud occurred via payment into the SDQ/Leatherback account on the Leatherback / Rexel /Providus Bank platform.
>
> We are also aware that there are active criminal investigations ongoing in Nigeria by the Cyber Crime Unit (Inspector General of Police's office) and the Economic and Financial Crimes Commission. These investigations are looking at allegations of fraudulent conversion and disappearance of funds (over $10 MM) related to the banking account of SDQ / Leatherback in Providus Bank, which is located in Lagos, Nigeria.
>
> It is our hope that these apparent crimes will be quickly resolved and the funds recovered and returned to their rightful beneficiaries.

Defendant's counsel sent this email despite the clear instructions given by undersigned counsel which was accompanied with an answer to his questions; Defendant continued to send false statements to CFSB. Defendant sought to communicate to CFSB or imply that Leatherback is involved in criminal activity.

### III.    Legal Standard

For preliminary injunctions, this Circuit follows the Supreme Court standard laid out in *Winter v. Natural Resources Defense Council*, 55 U.S. 7 (2008), where the Supreme Court stated that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 55 U.S. at 20.  And all four requirements must be satisfied. *Id.*  Indeed, the Court in *Winter* rejected a standard that allowed the plaintiff to demonstrate only a "possibility" of irreparable harm because that standard was "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

## IV. Argument

Lolu Adubifa and/or Lavayo Energy are basically insisting that a financial institution, Leatherback, that accepts deposits from customers and facilitates wire transfers must be in cahoots with a former customer, SDQ Facilitators in this case, in defrauding them, conveniently ignoring the fact that the customer was, like every other customer, fully in control of all the deposits it made, and all the wire transfer instructions given to the institution. As such, its statements implicating Leatherback are a deliberate attempt at tarnishing Leatherback's image.

### 1. Leatherback Will Likely Succeed on the Merits

Under Maryland law,

> A defamatory statement is one that "tends to expose a person to public scorn, hatred, contempt or ridicule," and that "discourage[es] others in the community from having a good opinion of, or from associating or dealing with, that person." *Id.* (quoting *Batson v. Shiflett*, 602 A.2d 1191, 1210 (Md. 1992)). Maryland law distinguishes between statements that are defamatory per se and defamatory per quod. *Indep. Newspapers, Inc. v. Brodie*, 966 A.2d 432, 448 (Md. 2009). "Where the words themselves impute the defamatory character," without the necessity of innuendo or inferences drawn from context, a statement is defamatory per se. *Id.* (quoting *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1123 (Md. 1979)). By contrast, defamation per quod requires "extrinsic facts . . . in order to establish the defamatory character of the words" through context or innuendo. *Id.* (quoting *Metromedia, Inc.*, 400 A.2d at 1123).

*Clayton v. Fairnak*, CIVIL No. JKB-18-2134, at *4 (D. Md. Dec. 10, 2018).

In this case, the Defendant's statements to CFSB are defamatory *per se*. In Defendant's September 6, 2023, email to CFSB, Defendant falsely claimed that "funds were transferred to an account at Providus Bank controlled by the Letterback/SDQ for conversion from Naira to Dollar." This is a false statement, the account was controlled by SDQ, not Leatherback.

Defendant further stated that "Letterback/SDQ have failed to confirm payment despite funds being credited to their account." This is another false statement. Leatherback has already issued statements to Defendant, stating that the referenced funds were not paid into the SDQ account.

On September 11, 2023, after being warned to cease contacting CFSB, Defendant again stated to CFSB in an email that "[a]s of today, my client – a Delaware limited liability company – is part of a group that believes that they have been defrauded of funds paid. My client believes that this fraud

occurred via payment into the SDQ/Leatherback account on the Leatherback / Rexel /Providus Bank platform." Defendant made this statement after undersigned counsel had clearly stated in our September 7, 2023, email to Defendant that none of the funds referenced in Defendant's September 6, 2023, email was paid to SDQ's account on the Leatherback platform and that in fact the telexes paraded by Defendant was not issued by Leatherback. To assure Defendant of our statement, in the September 6, 2023, email, we attached an original Leatherback telex to illustrate the difference between the two. Moreover, Defendant never stated how he came by the telexes that he has been parading.

Defendant's statements to CFSB impute criminal conduct on Leatherback. Under Maryland law, "where the words themselves impute the defamatory character, it is defamation *per se*." *Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415 (Md. 2009). Defendant's words clearly states that Leatherback had knowledge of and participated in the alleged crime by SDQ despite evidence to the contrary, including statements from Leatherback to Defendant.

Defendant knows that it is neither Leatherback nor CFSB's customer. Leatherback cannot give Defendant access to SDQ accounts as that would be in violation of the confidentiality agreement between SDQ and Leatherback. The best that Leatherback can do is to affirm or deny whether it recognizes the transactions referenced by Defendant. Leatherback's response to Defendant was possible because the information disclosed in that response had already been disclosed to the authorities in Nigeria, an investigation involving the Defendant. Moreover, as Defendant stated in its email to CFSB, there is an ongoing government investigation into the funds SDQ collected from its customers in Nigeria. The whereabout of Defendant's funds will be uncovered by that investigation. More importantly, Defendant knows that Leatherback has no knowledge of what transpired between Defendant and SDQ Facilitators.

Similarly, neither SDQ nor Defendant are customers of CFSB. Leatherback is CFSB's customer. As such CFSB cannot divulge information to Defendant or any other private entity about Leatherback transactions because of confidentiality agreements and banking laws. Defendant knows that even SDQ is not CFSB's customer.

Knowing all this, Defendant's continuous communication with CFSB despite the cease-and-desist notice is not designed to garner information. Rather, it is designed to cast Leatherback in a negative light. Therefore, Leatherback will succeed on its defamation claim.

2. **Leatherback Would Likely Suffer Irreparable Harm in the Absence of Preliminary Relief**

The partnership between Leatherback and CFSB is a novel one. It solves gargantuan problems in cross-border transactions, especially for small and medium-sized businesses across the globe seeking to participate in international trade. For CFSB, Leatherback's ability to police its customers and to ensure that the access it provides to the US market is not abused is key to sustaining the partnership. CFSB has the option of discontinuing the relationship if it thinks that it is more troublesome than expected, regardless of whether there is evidence of wrongdoing on the part of Leatherback. The mere fact that CFSB's name is mentioned along criminal activity, especially where CFSB is inundated with calls and inquiries about its partner, is enough to spook CFSB. Therefore, if Defendant is allowed to continue with its defamatory conduct, it is only a matter of time before CFSB calls its relationship with Leatherback quits, and without CFSB, Leatherback's business model will crumble.

3. **The Balance of Equities is in Leatherback's Favor**

Defendant discontinuing communication with CFSB does not harm it in any way. First, CFSB has no relationship with Defendant. As such, CFSB is under no obligation to respond to Defendant. Second, even if CFSB wanted to respond to Defendant, CFSB cannot do so because it is bound by confidentiality obligations and banking laws not to disclose customer information to a third party. Third, Leatherback has responded to Defendant's enquiries and opened the door for further engagement with Defendant. As such, Defendant has an alternative avenue for satisfying its need for answers. Finally, the ongoing investigation in Nigeria is the right avenue for the Defendant to air his grievances. Leatherback is fully cooperating with that investigation.

In contrast, if Defendant can continue its defamatory conduct, as argued earlier, CFSB would likely conclude that its partnership with Leatherback is not worth the trouble, which would lead to Leatherback closing shop. Accordingly, the balance of equities clearly tilts in Leatherback's favor.

4. **An Injunction is in the Public's Interest.**

As stated above, the beneficiaries of Leatherback's business model are small and medium-sized businesses. They get to play in the big leagues at a fraction of the cost of similar services offered by the big banks. In fact, in a country like Nigeria, they may not get to play at all. If Defendant is not

stopped and it achieves its aim i.e., successfully poison the CFSB well, the solo businessmen and women and the small and mid-size businesses in the United States and across the world benefiting from the ease of international trade facilitated by Leatherback would be the biggest losers.

WHEREFORE, Plaintiff, **Leatherback**, respectfully requests that this Honorable Court:

A. **GRANT a Restraining Order against the defendant**.
B. And to issue such other and further relief as the nature of Plaintiff's cause may require.

Respectfully submitted,

Jimi Kolawole, Esq. CPF# 1512160013
Kolawole Law Firm LLC
7517 Cedar Grove Lane,
Elkridge, MD. 21075
443 546 8146 | oakolawole@justklf.com
Fax: 240 713 3242